IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2015

## STATE OF TENNESSEE v. JOE JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 13-00783     Lee V. Coffee, Judge**

---

**No. W2014-00901-CCA-R3-CD  -  Filed September 25, 2015**

---

A Shelby County Criminal Court Jury convicted the appellant, Joe Jackson, of aggravated assault and reckless endangerment.  The trial court imposed a total effective sentence of fourteen years.  On appeal, the appellant contends that the evidence was insufficient to sustain his conviction of aggravated assault.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

James E. Thomas (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Joe Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Jeff Jones and Sam Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On February 21, 2013, a Shelby County Grand Jury returned a multi-count indictment charging the appellant with attempted second degree murder, aggravated assault, employing a firearm during a felony, and reckless endangerment.  The charges stemmed from the appellant's attempt to shoot Kent Payne on November 6, 2012.

The victim, Kent Payne, testified at trial that he was fifty-five years old and that he and the appellant had grown up in the same neighborhood. Payne thought the appellant lived with his mother on Whitehaven Lane. At approximately 8:30 a.m. on November 6, 2012, Payne was walking on Whitehaven Lane to a nearby store when the appellant stepped into his mother's yard and told the victim, "N[***]a, you don't – you don't walk down my street."

Payne said that he kept walking but looked back and saw the appellant pursuing him in a sport utility vehicle (SUV). He saw a girl he knew and ran toward her, stopping beside her car in the driveway. She asked him why he was running, but he was concentrating on the appellant and did not respond. The appellant stopped the SUV on the street approximately twenty-five feet from Payne, got out of the vehicle, and pointed a gun at Payne. Payne said that the gun fit in the appellant's hand and appeared to be a small caliber, such as a .22 caliber revolver. The appellant said, "N[***]a." Payne pleaded, "Man, don't do that. Man, don't do that." Payne asked the girl to let him in her car, but she refused and locked the door. The appellant fired one shot at Payne, and Payne ran, fearing for his life. The appellant fired another shot as Payne fled through several yards toward Tulane Street, heading for a nearby BP service station.

Payne said that the appellant followed in the SUV. The appellant rolled down his passenger window and fired a third shot toward Payne. After the shot missed, the appellant drove away. When Payne arrived at the service station, he called 911.

After the police arrived, Payne accompanied them to the appellant's house. At that time, approximately fifteen to twenty minutes had elapsed since the shooting.

Payne said that he was not armed when the appellant threatened him and that he did not respond to the appellant's comments.

On cross-examination, Payne acknowledged that he had used two different aliases and that he had pled guilty to theft. Payne acknowledged he did not mention in his statement to officers or in his preliminary hearing testimony that the appellant used a racial slur.

Payne conceded that he told the police the appellant may have shot at him because the appellant thought Payne was having an affair with the appellant's wife. However, at trial, Payne asserted that he was not sure why the appellant shot at him.

Derekia Sanders testified that on the morning of November 6, 2012, she left her mother's house on Whitehaven Lane, planning to go vote. She was talking with someone on the telephone and saw the victim walking up the street, then he started running toward

her. The appellant was in a Mercedes SUV, following Payne. Payne ran around Sanders's car and asked her if he could get in the vehicle. Sanders said no. The appellant stopped his SUV, got out, and began chasing the victim. Payne ran around the car again, and the appellant shot at him. Sanders and the victim ducked to avoid being shot, then Payne ran toward Tulane Street. The appellant then fired a second shot at Payne.

Sanders said the appellant got back into his SUV and followed Payne. Later, Sanders was inside, telling her mother what she had seen, when the appellant walked up on the porch, jerked open the screen door, and asked what she was saying. Sanders told him she intended to call the police. The appellant responded, "Okay," then closed the door and left. After he left, Sanders called 911. The police responded about ten minutes later.

On cross-examination, Sanders said that after Payne was denied entry into her car, he asked permission to go into the house. She acknowledged that her statement to police did not include Payne's request to go inside the house.

Sanders clarified that when she and Payne ducked behind her car, she was on the side of the car and he was at the front of the car. She said she could not describe the appellant's gun because most of it was covered by the appellant's hand. Sanders said she did not pick up any bullets or shell casings before the police arrived.

Memphis Police Officer Joseph Stafford testified that around 8:30 a.m. on November 6, 2012, the police dispatcher informed him that a female had called and reported a shooting. Officer Stafford and his partner, Officer Marcus Lee, went to the scene and spoke with the complainant, who described the events. Officer Stafford searched the area but was unable to find any shell casings in the area.

Officer Stafford said that Payne called 911 and disclosed that he was at a store at the corner of Tulane Street and Shelby Drive. The officers went to the store to speak with Payne. Payne told the officer that the appellant had shot at him and that he would take the officers to the appellant's home. Payne did not say how he knew the appellant.

Officer Stafford said that before Payne got into the patrol car, the officers did a "pat-down"; they found no weapons on Payne. Payne gave the officers directions to the appellant's house and identified the appellant, who was standing in the yard, as the shooter. Officer Stafford then took the appellant into custody. The appellant consented to a search of his residence and his red Mercedes SUV. The officers did not find a gun but found some ammunition in the residence. Officer Stafford said that other officers searched the appellant's mother's residence but found no weapons, shell casings, or bullets.

- 3 -

Officer Stafford explained that after a semi-automatic handgun is fired, a shell casing is expelled. A revolver does not eject the shell casing, and it remains inside the gun until it is removed by hand. Therefore, if the appellant had fired a revolver, Officer Stafford would not expect to find shell casings in the area.

Officer Marcus Lee testified that when he and Officer Stafford arrived at the scene, they spoke with Sanders, who had reported the shooting. Sanders said that the appellant had fired "a few shots" at Payne. Eventually, the officers located Payne at a BP service station at the intersection of Shelby Drive and Tulane Street.

Officer Lee said that the crime scene was "a hundred yards" and that no physical evidence of a shooting was found in that area. Likewise, police found no weapons while searching the appellant's mother's residence.

On cross-examination, Officer Lee acknowledged that he did not find "bullet strikes" on any of the houses in the neighborhood, on Sanders's car, or on the road.

Officer Jamal Saulsberry testified that he took a statement from Payne. He said that Payne did not appear to be under the influence at the time. Officer Saulsberry also took a statement from the appellant after the appellant was advised of his Miranda rights. During the interview, the appellant was cooperative. Afterward, Officer Saulsberry asked crime scene investigators to check the appellant for gunshot residue. While waiting for the crime scene unit to arrive, the appellant was allowed to use the bathroom, after which he took a nap. When the investigators began photographing the appellant, he became "agitated" and "kind of slumped down and really just, you know, [became] uncooperative."

Officer J.R. Rector testified that he attempted to test the appellant using an "Alternate Light Source" (ALS). However, the appellant was uncooperative and would not sit still for the test. Afterward, Officer Rector swabbed the appellant's hands to test for gunshot residue. The test results revealed none of elements that would indicate the presence of gunshot residue. Officer Rector said that the result did not eliminate the possibility the appellant had fired a gun. He explained that the gunshot residue could have been eliminated if the appellant washed his hands.

Sergeant Kevin Bernard Baker testified that he advised the appellant of his Miranda rights and that the appellant agreed to give a statement. The appellant said that he went to his sister's house to make some repairs. At the house, he saw Payne smoking drugs and "ran him away." The appellant denied shooting at Payne.

The appellant chose not to testify or present evidence.

At the conclusion of the trial, the jury found the appellant guilty of reckless endangerment of Payne as a lesser-included offense of attempted second degree murder, aggravated assault of Payne, and reckless endangerment of Sanders. The trial court merged the reckless endangerment and aggravated assault of Payne into a single conviction of aggravated assault. On appeal, the appellant challenges the sufficiency of the evidence sustaining his conviction of aggravated assault.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in the instant case, a person commits an aggravated assault when that person knowingly or intentionally commits an assault and the assault involves the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). As pertinent to the instant case, a person commits assault by intentionally or knowingly causing another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(2).

The proof adduced at trial revealed that when Payne walked by the appellant's mother's house on his way to a store, the appellant stepped outside and told Payne not to

walk on the appellant's street. Payne continued walking to the store, and the appellant began following in his SUV. When Sanders stepped out of her mother's house, Payne ran toward her and asked to get into her car. The appellant stopped his SUV twenty-five feet away and got out of the vehicle, holding a small gun. Payne begged him to stop, but the appellant shot at him. Payne ran, and the appellant fired a second shot before getting into his SUV to pursue Payne. The appellant fired a final shot at Payne from his vehicle and then left.

The appellant complains that the evidence was insufficient to sustain his conviction of aggravated assault because the police were unable to find any physical evidence that a gun had been fired or that the appellant had a gun. We note, however, "[t]his [c]ourt has previously held that convictions based upon witness testimony alone are sufficient." State v. Tamaine Works, No. W2005-01048-CCA-R3-CD, 2006 WL 1491636, at *12 (Tenn. Crim. App. at Jackson, May 26, 2006) (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)); see also State v. Casey Colbert, No. E2005-02014-CCA-R3-CD, 2013 WL 3128698, at *15 (Tenn. Crim. App. at Jackson, June 18, 2013).

The appellant also complains that portions of Sanders' testimony were inconsistent, noting that she testified that when she first saw Payne, he was running down the street and the appellant was chasing him. The appellant notes that Sanders later testified that "when she first saw Payne he was walking and she had a normal conversation with him in a normal tone." Our review of the record reveals that Sanders' testimony about this issue was not inconsistent. Nevertheless, we note that the jury, as was its prerogative, heard the testimony and accredited the testimony of the State's witnesses, thereby resolving any inconsistencies in favor of the State. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence was sufficient to sustain the appellant's conviction of aggravated assault.

### III. Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE